UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AUTOMOTIVE SUPPORT GROUP, LLC,
d/b/a ASG RENAISSANCE and ASG
RENAISSANCE, LLC,

                     Plaintiff,

v.

DALE HIGHTOWER and DON RAY
MCGOWAN III,

                     Defendants.                   Case No. 11-11169
                                                  Honorable Patrick J. Duggan
and

DON RAY MCGOWAN III,

                     Counter-Plaintiff,

v.

AUTOMOTIVE SUPPORT GROUP, LLC,
d/b/a ASG RENAISSANCE and ASG
RENAISSANCE, LLC,

                     Counter-Defendant.
_____/

## OPINION AND ORDER GRANTING DEFENDANT DON RAY MCGOWAN III'S MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFF AUTOMOTIVE SUPPORT GROUP, LLC'S CLAIMS AGAINST HIM

       Plaintiff Automotive Support Group, LLC ("ASG") initiated this action against

former employees Dale Hightower ("Hightower") and Don Ray McGowan III

("McGowan") (collectively "Defendants"), raising several claims arising from

Defendants' alleged breach of their employment contracts.  McGowan filed a Counter-

Complaint against ASG for money he claims he is owed.  Although appearing for a deposition subpoenaed by ASG, Hightower has failed to respond to ASG's Complaint and ASG has filed a motion for default judgment against him.

Presently before the Court is McGowan's motion for summary judgment with respect to ASG's claims against him and his claim against ASG, filed pursuant to Federal Rule of Civil Procedure 56 on August 31, 2011.  The motion has been fully briefed and this Court held a motion hearing on October 20, 2011.[1]  For the reasons that follow, the Court grants summary judgment to McGowan on ASG's Complaint.  The Court is addressing McGowan's motion with respect to his Counter-Complaint in a separate opinion and order.

## I.      Summary Judgment Standard

Pursuant to Rule 56, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512 (1986).  After adequate time for discovery and upon motion, Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party

---

[1]On October 20, 2011, the Court also heard and granted ASG's motion for default judgment against Hightower.

2

bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

The movant has an initial burden of showing "the absence of a genuine issue of material fact." *Id.* at 323, 106 S. Ct. at 2553. Once the movant meets this burden, the "nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986) (quoting Fed. R. Civ. P. 56(e)). To demonstrate a genuine issue, the nonmoving party must present sufficient evidence upon which a jury could reasonably find for that party; a "scintilla of evidence" is insufficient. *See Liberty Lobby*, 477 U.S. at 252, 106 S. Ct. at 2512. The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See id.* at 255, 106 S. Ct. at 2513.

## II.    Factual and Procedural Background

ASG is a Michigan limited liability company with its principal place of business in Farmington Hills, Michigan. ASG does business under the names of "ASG Renaissance, LLC" and "ASG Renaissance," and also is the sole member, manager, and owner of Blue Force Services, LLC ("Blue Force").[2] ASG is an international professional services firm that actively engages in the business of providing human capital solutions, staffing, personnel, talent management, human resource outsourcing, recruitment process

_____

[2]For ease of reference, except where pertinent, the Court will refer to all entities as ASG.

outsourcing, technical services, performance management, diversity services, marketing, and other consulting and support services to clients. ASG's services include providing employees or matching personnel with clients in a wide range of industries.

Laurie Bradley ("Bradley") owns ASG along with Lizabeth Ardisana and Greg Rouke. The owners work in ASG's Michigan offices. Bradley is the President of the company, responsible for sales and operations of its "Human Capital Division." This division primarily handles contract staffing– i.e., finding talent for customers and providing the talent to work at the customer's location.

On or about November 29, 2004, Bradley, on ASG's behalf, hired Hightower to oversee a new office ASG was opening in Charleston, South Carolina. ASG expanded into South Carolina with the hope of diversifying its business beyond the automotive industry and into the government and defense business. (*See* ASG Resp. Ex. C at 25, 27-28.) Hightower was assigned the title of Vice President, Government Operations and Business Development. He signed an employment agreement on November 29, 2004. (Compl. Ex. A.)

In October 2008, ASG solicited McGowan to join ASG as a technical writer out of the Charleston office. A technical writer writes operations and maintenance manuals. ASG hired McGowan to work for Blue Force and he initially was assigned to one of Blue Force's clients in the defense industry, Force Protection Inc. McGowan began working for Blue Force after Thanksgiving 2008. He signed an employment agreement with Blue Force on January 2, 2009. (McGowan's Mot. Ex. G.)

4

The employment agreement signed by McGowan contains a non-compete clause, which provides in pertinent part:

> During the Restricted Period [from the date of the agreement until one year following termination or the date of any breach of certain provisions of the agreement, whichever is later], Employee shall not, directly or indirectly, on Employee's behalf or on behalf of any other company, organization, individual or legal entity, solicit business from or perform services for any Customer or Potential Customer of the Company.

(*Id.* ¶ 5.1.)  The employment agreement also contains a provision prohibiting employees from "interfer[ing] with any contract or agreement between the Company and any Customer or any prospective contract or agreement between the Company and any Potential Customer . . ."  (*Id.* ¶ 6(a).)  Finally, as relevant to McGowan's motion, the agreement contains provisions requiring employees to devote their full time and attention to ASG and its clients and prohibiting employees from using or disclosing ASG's confidential information.  (*Id.* ¶¶ 2.1, 7.)

Approximately four months after ASG assigned McGowan to work for Force Protection, Force Protection issued a stop work order to ASG which led to a $700,000 billing dispute between the two entities.  With the loss of this client, Bradley decided to lay off most of the employees in the Charleston office.  She retained Hightower, McGowan, and a few other employees.  McGowan was transitioned to a new role as a "hybrid employee" in that he spent part of his time as a "billable employee" working as a technical writer for other ASG clients and his remaining time as an "overhead employee"

5

assisting Hightower's efforts to develop new clients primarily for Blue Force.[3]  At

Hightower's direction, McGowan participated in conference calls with prospective new

clients, developed marketing materials, and helped draft proposals.  During Summer

2009, Hightower also asked McGowan to redesign Blue Force's website to make it more

professional and attractive to prospective clients.

In September 2009, Hightower also asked McGowan to redesign a website for a

company called "Staff Search and Rescue" ("SSR").  (McGowan's Mot. Ex. A at 19-20.)

Hightower provided McGowan with all of the content for the website and McGowan cut

and pasted this material into a new site with a better layout and color schemes.  (*Id*. at 27-

28.)  McGowan completed the work in several hours over a weekend.  (*Id*. at 20, 55.)  He

was not compensated for the time he spent redesigning the SSR website.  (*Id*. at 56.)

McGowan testified that, "almost immediately," he doubted that SSR was a real

company.  (*Id*. at 21.)  Hightower testified during his deposition that he told McGowan

that SSR was "a placeholder."  (McGowan's Mot. Ex. B at 80.)  As Hightower further

explained during his deposition:

> Staff Search & Rescue, it's a bookmark on the web.  It's a placeholder.  It's not a
> business. . . .
>
> . . . It was a book– it was a placeholder in time.  It was a way to start, you
> know, looking at – start building a company.  It's a placeholder.  That is
> what it is.  I don't know how to say any more than that.  It wasn't a
> company. . ..

---

[3]ASG billed the pay rate of "billable employees" to its clients and charged a mark
up as a fee for its services.  "Overhead employees" worked directly for ASG.

(*Id*. at 40-41.)

Also in September 2009, Hightower asked McGowan to establish a corporate group for SSR on "LinkedIn," a social networking website popular with professionals. (*Id*. Ex. A at 28-29.) To complete this task, McGowan copied and pasted data provided by Hightower onto an online LinkedIn form. (*Id*. at 29, 34.) It took him approximately one or two minutes to create the LinkedIn account for SSR. (*Id*. at 55.) From the information entered by McGowan, LinkedIn's software created webpages for SSR's account. (*Id*.) McGowan neither reviewed the finished product generated by LinkedIn nor visited SSR's LinkedIn webpages. (*Id*. at 36, 50.) On the LinkedIn webpages for SSR, McGowan is identified as the "owner" of the group. (ASG's Resp. Ex. I.) According to McGowan, he did not have any knowledge of or know the status of SSR after creating the website and the LinkedIn account. (*Id*. Ex. A at 66.)

Hightower in fact testified during his deposition that he never invited McGowan to be a part of or be involved in SSR. (*Id*. Ex B at 82.) Hightower further testified that the only help he sought from McGowan with respect to SSR was assistance with "some Web stuff." (*Id*. at 84.) Hightower, however, created a SSR e-mail address for McGowan: DMcGowan@StaffSearchRescue.com. (*Id*. at 71.) Hightower explained that he did this so McGowan could help him with SSR's website. (*Id*. at 71-72.) According to Hightower, SSR never had any employees and never paid wages to anyone and no one ever received any financial benefit or compensation as a result of working for SSR. (*Id*. at 77.) Hightower also never prepared or submitted any paperwork to have SSR

7

organized or formed as a company or other entity. (*Id*. at 77-78.)

Around October 2010, Bradley started to have "a very uneasy feeling" about the employees' activities in the South Carolina office. (ASG's Resp. Ex. C at 54.) When Bradley called the office on several occasions and asked for Hightower– who she was told was in the office– she suspected that she was being transferred to his cell phone. (*Id*. at 52-54.) When she visited the office for meetings, she felt that she "was being managed by what [the employees] were saying" and noticed "little glances between people." (*Id*. at 54.) Bradley became suspicious about McGowan's billings for work-in-progress related to one of ASG's clients, Raydon, when that work failed to materialize in business from Raydon. (*Id*. at 54-55.) When Bradley asked McGowan to arrange a meeting between herself and the customer, she felt that McGowan was stalling by making up reasons why the meeting could not happen. (*Id*. at 55.) Bradley ultimately came to the conclusion that ASG was "spending too much money for a later payday" that she was not "getting assurances . . . was going to happen" and that ASG could not afford to keep the South Carolina staff to continue pursuing work. (*Id*.)

Around the same time, ASG's Human Resources Director, Lisa Speaks, brought a printout of SSR's LinkedIn account to Bradley. (*Id*. at 68.) The printout identified McGowan as the account owner. (*Id*.) Bradley also received a copy of the Charleston Regional Business Journal with a display advertisement for SSR. (*Id*. at 72-73.) Bradley did not possess any information connecting Hightower to SSR, but she suspected his involvement. (*Id*. Ex. 75.)

Bradley eventually decided to close the Charleston office and terminate the employees remaining there, which by that time included Hightower, McGowan, and two other individuals.  The termination date was set for December 8, 2008, and Bradley planned to use the termination meetings as an opportunity to get information from McGowan and Hightower about SSR.  (*See* ASG's Resp. Ex. C at 76.)  Bradley therefore decided to terminate Hightower and McGowan separately.  She brought McGowan to Farmington Hills, Michigan, for his termination and assigned the task to Speaks and ASG Vice President Rick Simon.  McGowan was informed that he was coming to Michigan for his performance review. On the same date, Bradley arrived unexpectedly at the Charleston office to meet with Hightower.

At their December 8 meeting with McGowan, Speaks and Simon explained that the business in Charleston was not going as ASG hoped and that ASG therefore was closing the Charleston office and terminating McGowan effective immediately.  (ASG's Resp. Ex. D at 14.)  Speaks then asked McGowan whether he had any knowledge of SSR. (*Id.*)  According to Speaks, McGowan "indicated that Dale Hightower had asked him to complete a website, I think he said, a couple of years ago for SSR, and that that was the only knowledge he had."  (*Id.*)  During his deposition, McGowan recalled telling Speaks and Simon that he did not think SSR was a real business.  (*Id.* Ex A at 47.)  Simon and Speaks then presented McGowan with a severance agreement, which he signed.  (*Id.*; McGowan's Mot. Ex. H.)

Pursuant to the terms of the severance agreement,  ASG agreed to pay McGowan a

9

severance of $2,500.  (McGowan's Mot. Ex. H.)  In exchange, McGowan agreed to
"release ASG Renaissance from any and all claims, whether known or unknown, arising
up to the date of this agreement."  (*Id*.)  The severance agreement further states that ASG
will pay McGowan his final paycheck ($750) for the period December 6-8, 2010.  (*Id*.)

McGowan was unemployed for several months after his termination from ASG
and he received unemployment compensation despite ASG's attempt to challenge his
entitlement to such compensation.  McGowan eventually was hired as a technical writer
by Calgon Carbon Corporation in Pittsburgh, Pennsylvania.  (McGowan's Mot. Ex. A at
62-63.)

At her December 8 meeting with Hightower, Bradley told Hightower about the
decision to close the Charleston office.  (ASG's Resp. Ex. C. at 87.) Bradley then asked
Hightower about SSR.  (*Id*.)  During her deposition in this case, Bradley related the
following conversation between herself and Hightower that followed:

> He said, "Well, what do you want to know?"  I said I wanted to know is it
> doing business? What is it? How much time– why are you doing this?  And
> he said, "It was a name I thought up a long time ago to try and help my son
> earn some money, but it hasn't done any business.  It's not doing anything,
> Laurie; it's just a name"; so I said, "So you haven't been soliciting my
> customers for business?" "Absolutely not."  And I asked him if anybody in
> the office is doing it.  He said absolutely not.

(*Id*. at 88.)  Bradley asked Hightower how he would know whether or not anyone in the
office engaged in business competitive with ASG and, according to Bradley, Hightower
responded that it is a very small office.  (*Id*.)  At some point during their approximate
twenty-five minute meeting, Bradley terminated Hightower's employment.  He then left

10

the office.

When she flew to Charleston to meet with Hightower, Bradley brought Tim Watt ("Watt"), ASG's Information Technology Manager, to help pack up the office. Watt waited in a van in the parking lot while Bradley met with Hightower. After Hightower's departure, Watt packed up items in the office to be sent to ASG's Michigan office and identified those items belonging to employees that would be left for them to subsequently retrieve. In the process, Watt boxed items from employees' desks that were to be sent to Michigan and labeled boxes with the name of the employee from whose desk the items were purportedly retrieved.

At some time in December 2010, after Watt returned with the van to Michigan, Simon presented Bradley with a folder labeled "AAR/SSR." (ASG's Resp. Ex. Z ¶ 32.) ASG surmises that "AAR" refers to one of its long-established customers, AAR Aircraft Services in Oklahoma City, Oklahoma. (*Id*.) Inside the folder were twenty-nine resumes printed in April 2010 from an internet job board, monster.com, and copied onto SSR letterhead. (McGowan's Mot. Ex. K.) According to Bradley, Simon told her that the folder was among the Charleston office materials that Watt packed in a box and marked with McGowan's name. (*Id*. Ex. C at 96-97.) Bradley testified that she had ASG recruiters contact some of the candidates whose resumes were in the folder and that two candidates indicated that SSR had submitted their resumes to AAR. (*Id*. at 102-04.) Bradley had no knowledge, however, whether the candidates went to work for AAR. (*Id*. at 104.)

11

McGowan testified during his deposition in this case that he had never seen the resumes from the AAR/SSR folder until they were filed as an exhibit in this lawsuit. (McGowan's Mot. Ex. A at 51-54.)  In fact, Hightower testified at his deposition that he and his son, Travis Hightower ("Travis"), had printed the resumes from the Internet and that they were in his desk when he was laid off on December 8.  (*Id*. Ex. B at 127-29.) Hightower identified his handwritten notes at the top of some of the resumes.  (*Id*. at 131.)

After discovering the folder, Bradley contacted AAR's vice president, Dan Durning, to inquire about AAR's business with SSR.  According to Bradley, Durning told her that "he knew some of [AAR's] recruiters were dealing with Staff Search and Rescue, but he didn't know how much business had actually transpired up until they had actually paid Staff Search and Rescue for any of their services."  (*Id*. at 105.)  Bradley acknowledged at her deposition and during her testimony at the hearing on ASG's motion for default judgment against Hightower that ASG did not inquire of ARS further to obtain any specific information about its dealings with SSR, including whether McGowan and/or Hightower were the individuals representing the company.  (*See id*. at 109-10.) Bradley further testified during her deposition and again at the motion hearing that ASG does not have information that any of ASG's clients or former clients did any business with SSR. (*Id*. at 118-19, 153.) Bradley contacted Raydon Corporation, one of ASG's customers, and was told that it had not done any business with SSR.  (ASG's Resp. Ex. C at 120.)

Nevertheless, Bradley believes that McGowan and Hightower, through SSR, have

12

solicited and obtained business from ASG's clients and former clients.  ASG also

maintains that McGowan and/or Hightower stole three ASG laptop computers that ASG

shipped to the Charleston office.  The computers arrived before McGowan began working

for ASG and he testified that, when he worked for ASG, he was issued a desktop

computer, only.  (*Id*. Ex. A at 51.)

In response to McGowan's and Hightower's believed wrongdoings, ASG initiated

this lawsuit against them in the United States District Court for the District of South

Carolina on January 21, 2011.  Relying on a forum selection clause in his employment

agreement with ASG, McGowan filed a motion to dismiss for improper venue or, in the

alternative, to transfer venue to the Eastern District of Michigan, which the South

Carolina court granted on March 22, 2001.  On that date, the matter was transferred to

this Court.  ASG filed an amended complaint against McGowan, only, on March 28,

2011.  ASG alleges the following counts in its First Amended Complaint:

(1)   Temporary Restraining Order/Preliminary and Permanent Injunction
(2)   Breach of Contract/Breach of Covenant of Good Faith and Fair
      Dealing
(3)   Breach of Fiduciary Duty/Duty of Loyalty
(4)   Interference with Contractual and Business Relations
(5)   Conversion
(6)   Unjust Enrichment/Restitution
(7)   Constructive Trust/Accounting
(8)   Civil Conspiracy
(9)   Declaratory Judgment [that Defendants forfeited any rights to
      receive severance pay; that ASG is released from any obligation to
      pay severance; and that any agreement to pay severance pay is null,
      void, invalid, and unenforceable]/Forfeiture
(10)  Declaratory Judgment [same as above]/Rescission
(11)  Violation of Michigan Uniform Trade Secrets Act

13

(12)   Enforcement of Covenants Against Competition Pursuant to Statute [Michigan Compiled Laws § 445.774a(1)]

(13)   Unauthorized Access of a Protected Computer, in violation of 18 U.S.C. § 1030(a)(4).

(Doc. 10.)  McGowan filed his Counter-Complaint against ASG on April 21, 2011, seeking his unpaid wages and severance pay.  (Doc. 22.)

As indicated earlier, McGowan filed a motion for summary judgment with respect to ASG's claims and his counter-claim on August 31, 2011.  ASG filed a response brief on September 13, 2011; and McGowan filed a reply brief on September 27, 2011.  ASG filed a motion for default judgment against Hightower on August 26, 2011, based on Hightower's failure to defend against its claims.

**III.    Applicable Law and Analysis as to ASG's Claims Against McGowan**

Each of ASG's counts against McGowan are premised on ASG's allegations that McGowan, along with Hightower, breached their employment agreement by:

> competing with ASG in violation of the terms, provisions, and covenants of the Employment Agreements; aiding ASG's competitor; soliciting business from and/or performing services for ASG's customers or potential customers; using and benefitting from ASG's customer and client lists, trade secrets, and other proprietary and confidential information; diverting former and/or potential customers from ASG to Defendants' own business and misappropriating ASG's assets, property, and business opportunities; interfering with ASG's contracts or prospective contracts with its customers or potential customers; recruiting, hiring, and/or soliciting for hire ASG's former employees and office personnel whose employment ended during the one year period prior to such recruitment, solicitation, and/or hire; misappropriating ASG's confidential or proprietary information and trade secrets; receiving benefits, financial and otherwise, from doing business with ASG's customers and/or potential customers; and/or disclosing and/or using ASG's confidential or proprietary information to compete with ASG.

14

(*See, e.g.*, Am. Compl. ¶¶ 18 [Count 1]; 37 [Count 2]; 45 [Count 3]; 50 [Count 4]; 62

[Count 6]; 73 [Count 8]; 80 [Count 9].)  Or ASG's assertion that:

> the Defendants have failed and/or refused to return to ASG all confidential
> and proprietary information, records, data, files, software, hardware,
> materials, and property belonging to ASG, including but not limited to
> several laptop computers and other computer data.

(*See, e.g., id.* ¶¶ 19 [Count 1]; 57 [Count 5]; 66 [Count 7].)  McGowan seeks summary

judgment, arguing that ASG lacks evidence that he engaged in the alleged wrongdoing.

This Court agrees, finding that ASG's assertions are based on unsubstantiated

suspicions and inadmissible hearsay.  To explain why the Court reaches this conclusion, it

will address the "evidence" against McGowan that ASG sets forth in response to

McGowan's motion and that its counsel again focused upon during the motion hearing.[4]

ASG states in the opening page of its response brief:

> McGowan himself has admitted acts in breach of his employment contract
> with ASG, including aiding in the solicitation of business for an entity
> competitive with ASG, and he has himself admitted that he knew and
> understood that Co-Defendant Dale Hightower had created an entity to
> compete with ASG and that such entity was not a customer or candidate-
> customer of ASG, and that he acted with . . . Dale Hightower, and his son,
> Travis Hightower, in promoting a competitive entity, Staff Search & Rescue
> . . . using the time, facilities, personnel and other assets of ASG at the
> expense of ASG, both in business lost and in money to promote his own
> interest.

(ASG's Resp. Br. at 1.)  There are no citations to the record following this statement and

the evidence ASG subsequently cites in its brief does not support a finding that McGowan

---

[4]Some of the evidence ASG discusses does not implicate McGowan in the alleged
wrongdoing and thus the Court will not address that evidence.

15

acted, on ASG time or using ASG resources or confidential information, to promote an entity that he knew was active and/or competed with ASG.

Nowhere in the record does McGowan admit to working for an entity competitive with or designed to compete with ASG or agree, as ASG asserts, that "SSR is a renegade entity." (*Id.* at 3.) ASG first refers to Travis' deposition testimony where he answers in the affirmative to the question: "Did – was Mr. McGowan aware of Staff Search & Rescue based on what you observe?" (ASG's Mot. Ex. X at 17.) There is nothing in Travis' testimony, however, indicating the basis for his belief. In fact, a review of the entire transcript from his deposition suggests that this was an unsupported assumption made by Travis. Moreover, Travis' answer would not inform the trier of fact as to what McGowan knew about SSR's business, specifically whether it was a real business competing with ASG.

When asked "what kind of contact" he had with McGowan, Travis responded:

It wasn't really business related. It was more, you know, if I had something wrong with my computer or talk about the game last night. It was never really like business stuff. I mean he would help me if I had a question about how to set a spreadsheet up, or if I had a question about how to search for something better, he would give me those answers. But it was never him and I [sic] sitting down together and working on stuff either.

(*Id.* at 16.) When asked directly what McGowan did for SSR, Travis replied: "To be honest sir, I really don't know too much . . ." (*Id.* at 19.)

ASG further points to McGowan's involvement in re-designing SSR's website, his creation of SSR's LinkedIn account, and the identification of McGowan as the owner of

16

that account on SSR's LinkedIn webpages. There is no dispute that McGowan created SSR's LinkedIn account by entering information Hightower provided onto an online LinkedIn form and that he re-designed SSR's website by improving the color schematics and layout. McGowan admits that he engaged in these activities. However, simply redesigning a website and/or entering information to create a LinkedIn account does not violate the terms of McGowan's employment agreement. There is no evidence that ASG's confidential information was used or disclosed in the performance of either activity. Without more, neither activity constitutes "solicit[ing] business from or perform[ing] services for any Customer or Potential Customer of the Company" or "[i]nterfering with any contract or agreement between the Company and any Customer or any prospective contract or agreement between the Company and any Potential Customer." In this Court's view, McGowan would have to be aware that SSR– for whom he created the LinkedIn account and redesigned the website– was both an operating company and engaged in activities competing with ASG. There is no evidence from which the trier of fact could conclude that he possessed this knowledge.

Contrary to ASG's representation, Hightower did not admit that he explained *to McGowan* that he (Hightower) set up SSR as a side business while employed at ASG. When asked if he told McGowan that he has a side business that he is starting or trying to get started, Hightower answered "no." (McGowan's Mot. ex. B at 83.) Hightower repeated several times during his deposition that he told McGowan only that SSR was a "placeholder." (*See, e.g., id*. at 84.) McGowan testified during his deposition that he

17

believed the information about SSR that Hightower provided to him to create SSR's LinkedIn account and that was contained on SSR's website was false; he doubted that it was ever a real company

ASG also refers to Hightower's recruitment of Jessica Lewis to do work for SSR, suggesting that because Lewis was McGowan's roommate in South Carolina, he must have known that SSR was an active company.  Hightower testified, however, that the only work he asked Lewis to do for SSR was editing the content that he drafted for the website.  (*Id*. at 86.)  Moreover, there is no indication of how much time Lewis spent on this task or, more significantly, whether she mentioned her activities to or discussed SSR with McGowan.

As ASG correctly asserts, McGowan admits that LinkedIn identifies him as SSR's LinkedIn account "owner."  (*See* ASG's Resp. Br. at 4.)  However, McGowan and Hightower denied that McGowan held any interest in or had any connection to SSR or that *they* identified him anywhere as having an interest or connection to SSR.  Neither McGowan nor Hightower could explain how the information that McGowan entered onto LinkedIn's Internet form was used by the site to create the finished product and McGowan had not seen the LinkedIn webpages for SSR before this lawsuit.  Moreover, as McGowan argues, the webpages that include this identifying information– which McGowan did not create–  constitute inadmissible hearsay.

ASG next asserts that the deposition testimony in this case is replete with "ads, advertisements, websites, directory listings and other identifications and references . . .

18

identifying . . . McGowan as [an] active participant[] in the staffing business."  (*Id*. at 5.)
ASG does not follow this assertion with a citation to any evidence.  To the extent ASG is
again referring to the LinkedIn website or some other website, this evidence is
inadmissible hearsay.

ASG also points to Hightower's testimony that he created an SSR email address
for McGowan.  Hightower testified that he created the address because he wanted
McGowan to help him.  (McGowan's Mot. Ex. B at 71.)  Yet there is no evidence that
Hightower ever informed McGowan of the email address' existence, that McGowan
otherwise was aware of the email address, or that McGowan ever agreed to help SSR
beyond creating the LinkedIn account and redesigning the SSR website.

ASG assumes that McGowan created the LinkedIn account for SSR or redesigned
its website on ASG time and using its resources; thereby violating his promise in the
employment agreement to "devote his . . . full time and attention to the Company . . ."
(*See id*. Ex. G ¶ 2.1.)  Taking McGowan's testimony that neither SSR nor Hightower paid
McGowan for his services, ASG argues that it paid him "for his time in the service of
SSR."  (ASG's Resp. Br. at 6.)  There is no evidence, however, that McGowan performed
any service for SSR during the hours that he worked for ASG.  To the contrary, the
evidence indicates that McGowan did the work outside of work hours (at night or over the
weekend), only.  (*See id*. Ex. B at 72; Ex. A. at 20, 55.)  ASG misrepresents Hightower's
testimony concerning the hours he believed McGowan spent on behalf of SSR.
Hightower did not testify that "McGowan had about 40 hours work for SSR," which ASG

19

asserts "would at least, minimally, implicate McGowan to service in the competitive business of SSR . . . beyond the mere creation of a redesigned web page . . ." (ASG's Resp. Br. at 6.) When asked "How much time do you estimate that Don McGowan would have spent doing any work on behalf of Staff Search & Rescue," Hightower answered: "*[l]ess than* 40 hours." (*Id*. Ex. B at 78, emphasis added.)

To demonstrate that McGowan was engaged in business for SSR and/or in competition with ASG, ASG next refers to Speaks' testimony reporting what she allegedly was told by Bradley concerning McGowan's billings related to Raydon. According to Speaks, "Bradley indicated to [her] that Mr. McGowan had said that he traveled there [i.e. to Raydon in Florida] quite often to do business, and the customer had commented that he had not seen Mr. McGowan in quite some time." (ASG's Resp. Br. at 9, citing Ex. D at 29.) Even if the Court ignores the fact that Speaks' testimony includes multiple levels of hearsay, there is nothing in this testimony to support ASG's suspicion that McGowan was using the billed time to compete with ASG.

Finally, ASG relies on the AAR/SSR folder containing resumes that were sent to AAR. ASG fails, however, to present admissible evidence to demonstrate or suggest that the folder or resumes in fact were found in McGowan's desk. McGowan presents evidence, in comparison, demonstrating that the items belonged to Hightower.

In short, the only "evidence" ASG has to submit to a jury to show that McGowan engaged in the alleged wrongdoing is its unsubstantiated suspicions and inadmissible hearsay. ASG is asking the Court to deny McGowan's motion for summary judgment

20

because *ASG believes* McGowan was actively involved in a company attempting to solicit ASG's business, used ASG's proprietary information for this purpose, and stole ASG's laptop computers.  ASG contends that it is the jury's role to decide whether McGowan is being truthful when he claims that his only involvement with SSR was redesigning its website and creating a LinkedIn account at Hightower's request, that he did not believe at the time that SSR was a real company, and that he was never issued and never took ASG's computers.  Rule 56, however, requires a party responding to a summary judgment motion to present admissible evidence to demonstrate a genuine issue of material fact. *See* Fed. R. Civ. P. 56(c)(1), (2).

The extent to which ASG is off the mark in its case against McGowan is illustrated by the hypothetical that ASG's counsel presented at the motion hearing.  Counsel argued that this case is analogous to entering a room and finding two people, one of whom is stabbed in the chest, and being able to infer that the other person was the perpetrator. Even if the asserted inference in counsel's hypothetical is proper, the hypothetical is in no way analogous to the facts of the present case.  Here, there is not only one person in the room capable of perpetrating the alleged wrongdoing; there are at least two.  Further, every shred of admissible evidence implicates only one of those individuals (i.e. Hightower).  The Court additionally notes that in this case there is no evidence that anyone in the room was even injured.

For these reasons, the Court concludes that McGowan is entitled to summary judgment with respect to ASG's claims against him.

21

Accordingly,

**IT IS ORDERED**, that Defendant Don Ray McGowan III's Motion for Summary

Judgment is **GRANTED** with respect to Plaintiff Automotive Support Group, LLC's

Complaint.

Date:  October 26, 2011                    s/PATRICK J. DUGGAN
                                           UNITED STATES DISTRICT JUDGE

Copies to:
Counsel of Record

22